## *In re* HOWARD'S ESTATE.

### (3 Misc. Rep. 170.)

*(Surrogate's Court, Cattaraugus County, Filed March, 1893.)*

**1. CONSTRUCTION OF WILL—ORIGINAL GIFT.**

Testator directed that the residue of his real estate should, upon the decease of his wife, to whom he had given the income thereof for life, descend (*inter alia*) "to my sisters and their heirs and assigns, and to the children of my deceased brother and their heirs and assigns. The children of any of my sisters or my brother are only to receive the same share that my brother or sisters would receive if they were living at the decease of my said wife." A sister of testator had died before the execution of the will, leaving a son whom testator had no reason to disinherit. *Held*, that such son was entitled to take the share his mother would have received had she survived testator's widow, not by way of substitution, but as a substantive independent original gift.

**2. SAME—LAPSED LEGACY—RESIDUE.**

Such will directed payment of the income to the widow for life or until her remarriage, and in the latter event she was to receive only one-half the income. The widow remarried, and thereupon the executor paid half the income to the testator's father (to whom testator gave the estate upon his wife's death) for his life, and upon his decease (prior to the wife's death), paid a part of the income to one of the residuary legatees under the father's will. *Held*, that the moiety of the income which lapsed upon the widow's remarriage became a part of the residue.

**3. JUDICIAL SETTLEMENT—RES ADJUDICATA.**

As such payments to the father had been allowed on a prior account of the executor, the judicial settlement thereof was *res adjudicata* on the subject.

**4. ACCOUNTING—ADVANCEMENT.**

The payment to the father's residuary legatee, who was also one of the residuary legatees under testator's will, should be treated as a payment to her upon her distributive share.

**5. EXECUTORS—DEATH OF LIFE TENANT.**

The executor will not be charged with interest on the funds of the estate after the death of the widow, when conflicting claims, which are

being litigated, are made to the residue, and he holds the funds in readiness to pay the parties entitled thereto on the termination of such litigation.

**6. EXECUTOR—COMPENSATION.**

An executor, who is an attorney, will not be allowed compensation for appearing on his own account, and on behalf of others interested, in an action brought to determine conflicting claims to a residuary share, other than the commissions allowed executors by law.

**7. SAME—TOMBSTONE.**

An expense of $300 for a tombstone will be allowed when the estate amounts to much over $6,000, the rights of creditors are not impaired, and the residuary legatees are collateral relatives only.

Judicial settlement of executor's accounts.

Norman M. Allen, executor, in person; J. M. Congdon, for Frank Parsel and others; W. S. Thrasher, for Henry Milks and others; J. E. Bixby, for Charlotte Kavanaugh; D. E. Powell, for Mr. Holtz.

DAVIE, S.—Norman Howard died in the town of Dayton, Cattaraugus County, on or about the 12th day of March, 1866, having no children or lineal descendants, and leaving a will dated March 10, 1866, which was admitted to probate by the Surrogate's Court of said county April 3, 1866. Testator left him surviving, his widow, Betsey Howard, his father, Harry, and mother, Delila, Howard. At the time of the execution of said will, and the death of the testator, he had three sisters living—Charlotte Kavanaugh, Emeline Parsel, and Harriet Parsel. Another sister, Amanda Milks, died several years prior to the death of testator, leaving a son, Henry Milks, who still survives, and is the only heir of the said Amanda Milks, deceased. Alexander Howard, a brother of testator, also died before testator's death, leaving three children—William Howard, James E. Howard, and Amanda D. Countryman—all of whom are now living, and are the only heirs of the said Alexander Howard, deceased. Testator's two sisters, Charlotte Kavanaugh and Emeline Parsel, still survive. The other sister, Harriet Parsel,

died April 15, 1869, leaving her surviving, her husband, who is now deceased, and two sons—George Parsel, who is deceased without issue, and Frank Parsel, who still survives, and who is the only heir of the said Harriet Parsel, deceased. Harry Howard, the father of testator, died May 12, 1881; Delila Howard, the mother of testator, died in the month of August, 1888; and Betsey Howard, his widow, died on the 21st day of July, 1900. By the terms of his said will the testator bequeathed all his personal property to his widow, absolutely, and also gave and bequeathed to her the use and income of all his real estate, and the interest accruing from investment of the proceeds of sale of such real estate, in case a sale should be made, during her lifetime, but provided that in case of her remarriage she should be entitled to only one-half of such use, avails and income after such remarriage. Testator designated and appointed Norman M. Allen as the executor, and the said widow, Betsey Howard, the executrix, of said will, and authorized and empowered them to sell and convey said real estate, when they should deem it for the best interests of said estate so to do. Testator bequeathed to his cousin Daniel Howard a claim or demand which testator held against him, of about $175. He also bequeathed, at the death of his said wife, Betsey, the sum of $500 to his nephew, Arthur Hull; the same amount to Frederick Milks, the son of said Henry Milks; and the sum of $1,000 to the children of his deceased brother, Alexander Howard. After such bequests the said will further provides as follows:

"At the decease of my said wife, all the rest, residue and remainder of my said estate, after paying the bequests before made, shall descend to my father, Harry Howard, if he shall then be living, and, if he shall not be living at the time of the decease of my said wife, then the same shall descend to my mother, Delila Howard, if she shall then be living; and, if she shall not then be living, then the same shall descend to my sisters, and their heirs and assigns, and to the children of my deceased brother, and their heirs and assigns. The children of any of my sisters or my brother are only to receive the same

share that my brother or sisters would receive if they were living at the decease of my said wife."

The said widow, Betsey Howard, remarried in about one year after the death of the testator; and after such remarriage, and within about two years from testator's death, the said executor and executrix, under the power given them in said will, sold all the real estate of which testator died seized, and converted the same into money and securities. The surviving executor, Allen, now files an account of his proceedings as such, for judicial settlement, from which it appears that there is a residuum for distribution under the provisions of the item of said will above quoted; and a determination of the question as to who is entitled to the same necessitates a construction of said item of the will. The question raised is whether or not the said Henry Milks is entitled to share in such distribution.

It will be observed that none of the parties claiming the right to participate in such distribution are lineal descendants of the testator. The controversy is one entirely among collaterals, and the claimant is of the same degree of relationship to testator as some of the parties who are contesting his right. Various general rules have been formulated for the construction of wills, but the fundamental principle of interpretation is that the intention of the testator, where such intention can be ascertained and carried into effect, shall govern; and, when the language of a testamentary provision is equivocal or ambiguous such intention must be sought by reference to all the other provisions, and to the attendant facts and circumstances (Ritch v. Hawxhurst, 114 N. Y. 512, 21 N. E. Rep. 1009), and such construction should be adopted as to give effect, if possible, to all the provisions, without rejecting any clause or sacrificing any interest for repugnance, where such provisions can be reconciled (Taggart v. Murray, 53 N. Y. 233), and, where it appears that the testator designed and intended a general scheme for the disposition of his property, such scheme should be carried into effect, when not inconsistent with the rules of law (Roe v. Vingut, 117 N. Y. 204, 22 N. E. Rep. 933). In this case the questions

arise—First, was it not the design and intention of the testator, as evidenced by the item of the will above set forth, and all the surrounding facts and circumstances, to provide a general scheme for the distribution of the residuum of his estate, after the expiration of the life estate, among certain classes of relatives, the members of such classes to be determined at the time of distribution; and, second, if such was the design, is the claimant Henry Milks included in either of such classes?

It is entirely apparent that the testator did not design or intend an immediate gift of any portion of his estate to his sister, or the heirs of a deceased sister or brother, with simply the time of payment or enjoyment postponed to the death of the widow. The element of futurity is annexed to the substance of the gift. The particular parties entitled to take could not be determined until the death of the wife. The gift was not to particular persons *nominatim,* but to certain classes existing at the termination of said intermediate estate. The language of the provision is quite distinct:

"After the death of my said wife, * * * all the rest, residue and remainder of my estate shall descend * * * to my sisters, and to their heirs and assigns, and to the children of my deceased brother, their heirs and assigns. The children of any of my sisters or brother are only to receive the same share that my brother or sisters would receive if living at the decease of my said wife."

Consequently, I am of the opinion that it should be held that the parties constituting the said classes at the date of the death of Betsey Howard are entitled to take under said provisions of the will, not in any manner by substitution, but as original legatees. Does Henry Milks belong to either of these classes? There is no intimation from the evidence in this case, or from the history of the family, that any reason existed to induce testator to discriminate, in the final disposition of his property, against his nephew Henry Milks, no suggestion that the son of the deceased sister did not sustain the same relations to the testator as did the children of the deceased brother, or why one

should be less the object of his bounty than the others. No ill will on the part of the testator towards Henry Milks is shown, nor does it appear that the testator did not entertain the same degree of love and affection for his sister Amanda, while she was living, as for the other sisters who survived her. No facts are presented showing, or tending to show, that the claim of those seeking to deprive Henry Milks of his right to participate is fair, just, or in harmony with the wish of the testator, but we are asked to exclude him simply from an arbitrary reading of the clause of the will referred to, unaided by any explanatory circumstances. This I am not willing to do. It has been distinctly decided that where the language of a limitation is capable of two constructions, one of which would disinherit an heir, and the other not, the latter will prevail. The intent to disinherit will not be imputed to a testator by implication, nor when he uses language capable of a construction which will not so operate. Low v. Harmony, 72 N. Y. 414. It is true that the case cited has particular reference to lineal descendants, but the reason of the rule is equally applicable where the controversy, as in this case, is entirely between collaterals. Of course, Henry Milks could not take any portion of this estate by substitution, but his claim is not based upon any such ground. "Where the children of the deceased person found their claim, not on a mere clause of substitution, but on a substantive, independent, original gift comprehending them, concurrently with another class of objects, the gift will extend to the children of the persons who were dead when the will was made." 2 Jarm. Wills (Bigelow's Ed.), 775; *In re* Crawford, 113 N. Y. 374, 21 N. E. Rep. 142; Teed v. Morton, 60 N. Y. 502. It must therefore be held that Henry Milks, Charlotte Kavanaugh, Frank Parsel and Emeline Parsel are each entitled to the one-fifth part of the residuum of said estate, and that the remaining one-fifth part be divided equally between William Howard, James E. Howard and Amanda D. Countryman.

After the remarriage of the widow, Betsey Howard, the one-half part of all the interest accruing upon said estate, down to

the time of her death, was paid to her and to her representatives. The other one-half was paid to Harry Howard during the time he survived after such remarriage. Upon what theory or principle such payment was made to him does not appear, and it is perhaps of little consequence at this time to inquire, for the judicial settlement of the executor's accounts under date of September 2, 1886, where such payment was allowed and credited, is undoubtedly *res adjudicata* upon that subject; but it does become a question for determination upon this accounting as to what disposition shall be made of the one-half part of said income accruing after the death of Harry Howard to the time of the death of the widow, Betsey Howard. The said Harry Howard left a will which was admitted to probate, and in which he appointed Emeline Parsel and William Howard executors, and in which certain specific bequests and devises were made, and the residuum of his estate was given to Charlotte Kavanaugh and Emeline Parsel, and since the death of Harry Howard the executor, Allen, has paid from time to time certain sums out of such accruing interest to the said Emeline Parsel, amounting in all to $619. The executors of the will of the said Harry Howard, deceased, derived no title, under his will, or from any source, to any port of such accumulating interest. Upon the remarriage of the widow the one-half part of the legacy to her, under the second item of said will, lapsed, and became a part of the estate for distribution. The rule is well settled that, where a will contains a general residuary clause, lapsed legacies go, not to the next of kin, but into the residue. *In re* Benson, 96 N. Y. 499 ; Riker v. Cornwell, 113 N. Y. 115, 20 N. E. Rep. 602. So, then, it must be held that the one-half of such income as accrued upon this estate after the death of Harry Howard constitutes a part of the residuum to be disposed of under the seventh item of said will, and the payments made to the said Emeline Parsel must be treated as an advancement or payment to her upon her distributive share.

In the account filed, no interest is credited to the estate or charged to the executor after the date of the death of the widow,

Betsey Howard, and in the objections filed to said account it is alleged that the executor should be charged with interest from that time. It does not appear from the evidence that any interest or income has been actually received by the executor since the death of the widow. So the question is whether the executor should be charged with interest by way of penalty for not investing the funds of said estate since that time. No funds or property belonging to the estate came into the hands of the executors, except that specifically bequeathed to the widow, until the sale of the real estate. There were times during the administration of said estate when all the funds thereof were invested, and other times when only a part thereof was, or could be, invested, although the executors used due diligence in making such investments. In the various accounts filed for judicial settlement, the executors are charged, and the estate credited, with interest upon the entire *corpus* of the estate, from the time of the sale of the real estate, at the rate of 7 per cent., to the 1st day of January, 1880, and at the rate of 6 per cent. from that time to the death of the widow, without any deductions whatever for such times as a part of the estate could not be invested. Shortly after the death of the widow the surviving executor began making preparations for closing up the affairs of the estate, paying the legacies, and attending to such other preliminaries as necessarily preceded a final settlement. In this, however, he was embarrassed and delayed by certain conflicting claims made upon him for payment of some of the legacies and distributive shares. Several persons claimed the share of William Howard, and several actions were brought regarding the share of Charlotte Kavanaugh, and in one of such actions, in which the executor, Allen, and the executrix, Betsey Howard, were named as parties defendant, an injunction was procured and served, restraining and enjoining the said executors from paying over any portion of the share of said Charlotte Kavanaugh until the further order of the court therein. Said suits are still pending and undetermined, without any fault or neglect on the part of the executor; and in view of these facts, and the

23

further facts that the specific legacies were due and payable at the death of the said widow; that said litigations were liable to be terminated at any time, and said parties, therefore, in situation to demand payment of their respective shares—the said executor was justified in holding the funds of said estate in readiness to meet such demands, and he should not be charged with interest because he has exercised such right.

In the various litigations brought in relation to the distributive share of Charlotte Kavanaugh, the executor, Allen, who was an attorney, appeared on his own account, and for certain other defendants who were interested in said estate, and rendered services as such attorney in and about the defense of said actions. While it is clear that such services were rendered in good faith, and for the benefit of said estate, the executor is not entitled to any compensation therefor, other than such commissions as are allowed him by law.   Collier v. Munn, 41 N. Y. 143; Lent v. Howard, 89 N. Y. 169.

The remaining question relates to the indebtedness of $300 incurred by the executor for a tombstone to be placed at the grave of the testator.   Shortly after the death of testator the executor caused an inexpensive tombstone to be placed at his grave.   The remains of deceased were subsequently removed to another burial place, and thereafter the executor entered into an agreement for the purchase of another tombstone for testator at an expense of $300.   The expense of a tombstone, if not excessive, will be allowed to an executor, upon his accounting. Wood v. Vandenburgh, 6 Paige, 277.   The term "funeral expenses" includes the cost of a suitable tombstone to be erected at the grave of the deceased.   Owens v. Bloomer, 14 Hun, 296. This expenditure being such a one as the executor was authorized to make, the only question is as to whether the amount is reasonable or not.   In Re Erlacher, 3 Redf. Sur. 8, where the estate amounted to $2,625, it was held that the administrator should be allowed only $250 of the $700 expended by him for monument, and inclosing burial lot.   In Re Mount, id. 9, note, the administrator, out of an estate of $938, paid $425 for

funeral expenses; and it was held that only $200 should be allowed for funeral expenses, and $50 for a gravestone. In Valentine v. Valentine, 4 Redf. Sur. 265, an expenditure of $350, where the estate was $13,000, was held not unreasonable. So it is apparent that there is no arbitrary rule for determining the question of reasonable funeral expenses and expenses of tombstone, but each case must be disposed of upon its own particular circumstances. In this case there was originally an estate of over $6,000, with accumulations thereon to much more than that sum. The rights of creditors are in no manner impaired by the expenditure, and, as against the legatees under the will of testator, all of whom are collateral, it must be held that the expense incurred is reasonable and proper.

(Note as to expenditure for tombstones, headstones and monuments:)

STATUTE.—GENERAL OBSERVATION.—WHAT IS A REASONABLE EXPENDITURE.—WHAT IS AN UNREASONABLE EXPENDITURE.—BEQUEST OF ENTIRE ESTATE FOR MONUMENT.— LEGACY FOR MONUMENT.—INSOLVENT ESTATES.

### STATUTE.

It is provided by the Code of Civil Procedure, section 2749, that the expression "funeral expenses" includes a reasonable charge for a suitable headstone.

### GENERAL OBSERVATION.

A reasonable expenditure suitable to decedent's estate and condition in life will be allowed for the cost of a tombstone. (Wood v. Vandenburgh, 6 Paige, 277; Ferrin v. Myrick, 41 N. Y. 315; Tickel v. Quinn, 1 Dem. 425; Owens v. Bloomer, 14 Hun, 296; Sheelz's Est. [Pa.], 2 Woodw. Dec. 407; Griffith's Est. [Pa.], 1 Lack. L. N. 311; Webb's Est., 165 Pa. St. 330; Griggs v. Vaghte [N. J.], 47 N. J. Eq. 179; Spire v. Lovell [Ill.], 17 Ill. App. [17 Bradw.], 559; Van Ernon v. Superior Court [Cal.], 76 Cal. 589; Hatchett v. Curbow [Ala.], 59 Ala. 576; Craps v. Armstrong [Iowa], 61 Iowa, 697.)

But where a decedent was a plain man, of economical and saving habits, a former member of the Society of Friends, a credit of $1,000 for a monument was reduced to $100, although decedent left an estate of $110,000, as the contrast between a monument costing $1,000 and decedent's habits and mode of living would be so great as to provoke comment, which such memorials should not do. (Taylor's Est., 3 Pa. Dist. Rep. 691.)

### What is a Reasonable Expenditure.

In Matter of Laud, 42 Hun, 126, an expenditure of $403 for a tombstone out of an estate valued at from $10,000 to $15,000 was held reasonable in amount, considering decedent's indebtedness at his death.

In Matter of Beach's Estate, 1 Misc. 27, it was held that $400 for a tombstone out of an estate of $8,000 would be allowed (although the expenditure reached the limit where it might be held to be unreasonable), the rights of creditors not being impaired, and none of the legatees but the widow objecting to the expenditure, especially as the executor had in good faith contracted for the monument, which was ready for delivery.

The expenditure of the sum of $200 for a tombstone out of personal estate valued at $26,000 is not extravagant. (Campbell v. Purdy, 5 Redf. 434.)

When a decedent's estate, after paying all debts, would, including real estate, leave a surplus of several thousand dollars, and the administratrix and decedent (her husband) had lived happily together for more than thirty years on the same farm, the court considered that the administratrix had done right in expending $175 for a monument over his grave. (Allen v. Allen, 3 Dem. 524.)

A testator directed by his will that his executor should erect a suitable monument to his memory. Decedent left personal estate to the value of over $226,000, besides considerable real estate. The executor expended $6,000 in the erection of a monument. The testator was in some respects a remarkable man, who had accumulated a considerable fortune, a handsome part of which he bequeathed, on account of their pecuniary condition, to the widow and children of General "Stonewall" Jackson, and a still larger part of which he left for the education of white children in Tennessee. The only objection came from

the residuary legatee, the widow approving of the expenditure. *Held,* that as the selection of the monument in reference to its suitability, was left entirely to the discretion of the executor, the court could not say that the executor, although liberal in his outlay, had so abused his discretion as would justify the interference of the court, especially as it had passed the ordeal of the lower courts and referees.   (Cannon v. Apperson, 14 Lea [Tenn.], 553.)

## What is an Unreasonable Expenditure.

When the estate amounted to $2,625, an expenditure of $670 for a monument was considered excessive, and $250 only was allowed.   The court said that the expenses of a monument should have been postponed till the amount of the estate was ascertained, and that, in any case, they would not be a proper charge as against creditors.   (Matter of Erlacher, 3 Redf. 8.)

An expenditure of $500 out of an estate valued at $8,000 was considered excessive.   (Owens v. Bloomer, 14 Hun, 296.)

A testator directed, by his will, his executor to erect a suitable monument over his grave, and left the expense thereof entirely discretionary with him.   The executor contracted for the erection of a monument to cost $1,455.   The estate was valued at $11,000.   *Held,* that although an absolute discretion was conferred upon the executor, it should be exercised according to law and the principles of justice, and the residuary legatee objecting, the proposed expenditure should be reduced to $700. (Matter of Luckey, 4 Redf. 95.)

In Burnett v. Noble, 5 Redf. 69, the executor, who was vested with an absolute discretion for the purpose under the will, asked that $700 should be allowed for a monument, and it was *held* that as the estate for distribution amounted only to $2,000. a sum of $250 would be a reasonable allowance, as the executor's discretion should be exercised within the limits of law.

Where the real and personal estate was of the value of $17,000, an expenditure of $2,000 for a vault and tomb was reduced to $1,000, as the court found no sufficient reason in facts or in law for the allowance of so large a sum without express authority in the will.   (Matter of Shipman, 82 Hun, 108.)

## Bequest of Entire Estate for Monument.

In Emans v. Hickman, 12 Hun, 425, the facts were:   Tes-

tator made his will as follows: "To my executor, all money in my possession, all money due from any source or sources whatever, and all property of every kind and description held by me, for my funeral expenses and the erection of a monument to my memory in the Purdy yard, Phillipstown, Putnam County." Testator's estate amounted to $1,200. The executor brought the action for the construction of the will. *Held,* that as the will contained no direction to the executor to expend the whole of his estate for the purposes expressed, nor contained any limitation of the executor's discretion on the subject, the testator intended only that a reasonable sum should be expended for funeral expenses and a monument, and that the balance should go to his heirs-at-law; that as no creditor would be injured, and the heirs consented, $150 was a sufficient sum to expend for a monument—and that after such expenditure and the payment of reasonable funeral expenses, the balance was to be distributed amongst testator's heirs-at-law as in cases of intestacy.

The court observed that "No doubt it was competent for testator to direct that the whole estate should be spent for his funeral expenses, and for a monument," and that the question was whether the will manifested such an intention.

### LEGACY FOR MONUMENT.

In Masters v. Masters, 1 Peer, Wms. Rep. 423 (6th London Ed.), it was held that a legacy of £200 given by testatrix for a monument for her mother, being a debt of piety to the memory of her mother, from whom the testatrix received the greater part of her estate, should not abate with other legacies, when there was a deficiency of assets, but should be paid in full.

This decision was followed in Wood v. Vandenburgh, 6 Paige, 285.

### INSOLVENT ESTATES.

A credit will not be allowed for the cost of a headstone where the estate is insolvent. (Villee's Est., 9 Lane L. R. [Pa.] 353; Little v. Williams, 7 Ill. App. 67; Lund v. Lund, 41 N. H. 355.)